**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, Garrett S. Hassett, being sworn, state:

**Agent Background**

1. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since September 2018, and am currently assigned to the Boston Field Office, Organized Crime Drug Enforcement Task Force ("OCDETF") Strike Force. Prior to my current employment with the FBI, I was employed by the Rhode Island State Police for approximately seven years. During that time, I worked in the uniform division and as a member of the Domestic Highway Enforcement team.

2. During my career in law enforcement, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug trafficking conspiracies. In the course of conducting criminal investigations, I have employed the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term narcotics investigations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and toll record data, conducting court-authorized electronic surveillance; and preparing and executing search warrants that resulted in substantial seizures of narcotics, firearms, and other contraband.

3. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal

identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

4. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.

5. Based on my training and experience, narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs, to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers. Within the United States and the District of Massachusetts, illegal drugs and drug money are most often transported in motor vehicles.

## Purpose of the Affidavit

6. I submit that there is probable cause to believe that on November 15, 2024, November 25, 2024, and December 13, 2024, Cesar Nunez LOPEZ committed three counts of distribution and possession with intent to distribute fentanyl, in violation of Title 21, United States Code, Section 841 (the "Charged Offenses"). Based on the facts set forth in this affidavit, there is probable cause to believe that LOPEZ has committed the Charged Offenses.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

**Probable Cause**

*On November 15, 2024, LOPEZ Sold 99 Grams of Fentanyl to a Cooperating Witness.*

8. In November 2024, through a confidential source, investigators identified Cesar Nunez LOPEZ as a potential drug trafficker. The confidential source provided LOPEZ's phone number as 646-294-1599 (the "Target Mobile Phone"). Investigators directed a cooperating witness who is in a position to testify (the "CW"),[1] to reach out to LOPEZ to set up a fentanyl transaction.

9. On November 13, 2024, investigators directed the CW to exchange text messages with LOPEZ over the Target Mobile Phone for the purpose of finalizing arrangements for a 100-gram fentanyl sale. The CW exchanged multiple text messages with LOPEZ and sent screenshots of those text messages to investigators. Investigators have reviewed those text messages. In these text messages with LOPEZ, the CW confirmed that he would purchase 100 grams of fentanyl for $3,400 on Friday, November 15, 2024, at 11:00 a.m.

10. On November 14, 2024, the CW received text messages from LOPEZ, using the Target Mobile Phone. The CW sent screenshots of these text messages to investigators. In these

---

[1] The CW is a documented source of information who is cooperating with the FBI. The CW has a criminal record that includes multiple arrests for drug distribution offenses, falsifying physical evidence, and OUI. The CW first began to cooperate with law enforcement after an arrest during a drug distribution investigation being conducted by the Rockingham County Sheriff's Office. The CW agreed to cooperate with investigators in hopes of receiving a dismissal of charges or a lesser sentence for his narcotics trafficking. The CW has been cooperating with the FBI for approximately one year. The FBI has compensated the CW financially in exchange for the CW's cooperation. Information provided by the CW has been corroborated to the extent possible and has led to the identification of drug traffickers and the seizure of narcotics. Information provided by the CW is believed to be reliable.

text messages, LOPEZ confirmed with the CW that LOPEZ was still planning on meeting the following day to conduct the fentanyl transaction.

11.     On November 15, 2024, investigators met with the CW at a predetermined location. Investigators searched the CW and the CW's vehicle for contraband and currency with negative results. Investigators equipped the CW with an audio/video recording device and provided the CW with $3,400 in Official Agency Funds ("OAF"). During this meeting, the CW showed investigators text messages from earlier that morning between the CW and LOPEZ, using the Target Mobile Phone. In the text messages, LOPEZ confirmed he was on his way to meet the CW.

12.     On November 15, 2024, at approximately 11:08 a.m., the CW drove to the meeting location, a Market Basket parking lot in the greater Boston area. Investigators surveilled the CW to the parking lot and established surveillance in the parking lot to observe the expected drug transaction. At approximately 11:17 a.m., the CW arrived in the parking lot.

13.     At approximately 11:21 a.m., investigators observed LOPEZ in the parking lot walking towards the CW's vehicle. Investigators were able to identify LOPEZ based on their review of prior arrest booking photographs of LOPEZ. LOPEZ then entered the CW's vehicle in the front passenger side. Once inside the vehicle, LOPEZ handed the CW a black sock containing a clear plastic bag with a white powdery substance inside believed to be fentanyl. The CW handed LOPEZ the $3,400 in OAF. LOPEZ and the CW discussed the difference in fentanyl packaging in Boston and New York. At approximately 11:26 a.m., LOPEZ exited the CW's vehicle and walked into the Market Basket.

14.     While being surveilled by investigators, the CW drove back to the predetermined meeting location and met with investigators. Once there, the CW turned over the suspected fentanyl and the audio/video recording equipment to investigators. Investigators searched the CW

and the CW's vehicle for contraband and currency with negative results. Investigators conducted a field test of the substance which yielded a positive result for fentanyl. Investigators sent the suspected fentanyl to the DEA laboratory for testing. Lab results showed the presence of fentanyl with a net weight of 99.4 grams.

15. Investigators continued to maintain surveillance around the Market Basket. At approximately 11:43 a.m., investigators observed LOPEZ exit the Market Basket and enter a grey Honda CRV, bearing Massachusetts registration 1KCJ93. LOPEZ departed the parking lot in the CRV. Investigators were able to observe that LOPEZ was the driver and there were no other occupants in the CRV. Investigators followed LOPEZ to Auburn, Massachusetts and terminated surveillance.

*On November 25, 2024, LOPEZ Sold Approximately 500 Grams
of Suspected Fentanyl to the CW.*

16. At investigators' direction, the CW continued to communicate with LOPEZ, using the Target Mobile Phone, in the days following the November 15, 2024 fentanyl deal. Investigators directed the CW to arrange another fentanyl purchase with LOPEZ to take place on November 25, 2024. At investigators' direction, the CW and LOPEZ, using the Target Mobile Phone, exchanged numerous text messages. Investigators have reviewed these text messages. In one text message, the CW stated, "500 para el Viernes," meaning 500 for Friday. LOPEZ responded, "Usted me avisa selo pondre 32 porke usted sabe esta lejo el camninito." Investigators have translated this text message to state, "You let me know, I'll put it at 32 because you know the road is far away." Based on experience and training, the CW and investigators understood the CW's text message to mean that the CW would purchase 500 grams of fentanyl on Friday, November 22, 2024. Investigators believe LOPEZ's text message meant that LOPEZ would

charge $32,000 for an entire kilogram of fentanyl, meaning the price of 500 grams would be $16,000, based on LOPEZ's additional travel costs. As explained above, LOPEZ described his experience with fentanyl in New York. At investigators' direction, the CW sent another text message to LOPEZ, using the Target Mobile Phone, and requested the fentanyl deal take place on Monday, November 25, 2024. In a reply text message, LOPEZ acknowledged, and the CW and LOPEZ agreed to confirm the deal over the weekend.

17. On November 22, 2024, the CW exchanged text messages with LOPEZ, using the Target Mobile Phone, and sent screenshots of those text messages to investigators. Investigators have reviewed those text messages. The CW stated that everything was good for Monday. LOPEZ, using the Target Mobile Phone, responded, "OK, 500 Verdad, En el mismo sitio." Investigators have translated this text message to state, "Okay, 500 true, in the same place." Based on experience and training, investigators believed that LOPEZ confirmed he would sell the CW 500 grams of fentanyl on Monday (November 25, 2024) and asked if they would meet at the same location as their November 15, 2024 fentanyl deal. The CW confirmed that he wanted to buy 500 grams and told LOPEZ he would send him the location over the weekend.

18. On November 24, 2024, the CW exchanged text messages with LOPEZ, using the Target Mobile Phone, and sent screenshots of those text messages to investigators. Investigators have reviewed those text messages. The CW confirmed they would meet around 11:00 a.m. the following day, Monday, November 25, 2024. LOPEZ responded that he would be there. The CW then sent a text message with the location, a Home Depot parking lot in Watertown, Massachusetts. LOPEZ responded, "OK Dios Mediante." Investigators have translated this to mean, "Okay, god willing." Based on experience and training, investigators believed that LOPEZ confirmed he

6

would meet with the CW the following day, Monday, November 25, 2024, in Watertown to sell the CW fentanyl.

19. On November 25, 2024, investigators met with the CW at a predetermined location. Investigators searched the CW and the CW's vehicle for contraband and currency with negative results. Investigators equipped the CW with an audio/video recording device and provided the CW with $16,000 in OAF, the agreed-upon price for 500 grams of fentanyl. During this meeting, the CW showed investigators text messages from earlier that morning between the CW and LOPEZ, using the Target Mobile Phone. In the text messages, LOPEZ confirmed he was on his way to meet the CW.

20. On November 25, 2024, at approximately 11:25 a.m., investigators surveilled the CW as he drove to the meeting location, the Home Depot parking lot. The CW arrived in the parking lot at approximately 11:30 a.m. Investigators maintained surveillance in the parking lot to observe the expected drug deal.

21. At approximately 11:32 a.m., investigators observed LOPEZ driving his grey Honda CRV, bearing Massachusetts registration 1KCJ93, in the Home Depot parking lot. LOPEZ parked his CRV next to the CW's vehicle. LOPEZ exited his vehicle and entered the front passenger seat of the CW's vehicle. The CW handed LOPEZ the $16,000 in OAF. LOPEZ counted one of the bundles of currency to verify the amount. While counting the money, LOPEZ and the CW discussed future drug deals. In lightly coded language, the CW stated that he would buy more fentanyl as long as the quality was good. At approximately 11:39 a.m., LOPEZ exited the CW's vehicle and walked to his CRV. LOPEZ opened the rear driver's side door and picked up a brown paper bag from the back seat. LOPEZ then carried the brown bag to the rear driver's side of the CW's vehicle and placed the brown bag inside the rear seat area of the CW's vehicle.

LOPEZ then returned to his CRV and drove out of the parking lot. Investigators followed LOPEZ until he reached the Massachusetts turnpike and then terminated surveillance.

22. While being surveilled by investigators, the CW drove back to the predetermined meeting location and met with investigators. Once there, the CW turned over the brown bag containing the suspected fentanyl and the audio/video recording equipment to investigators. Investigators searched the CW and the CW's vehicle for contraband and currency with negative results. Investigators conducted a field test of the substance which yielded an inconclusive result. Based on experience and training, investigators regularly conduct field tests of suspected fentanyl which yield inconclusive results, but later laboratory testing confirms the presence of fentanyl in the substance. Based on experience and training, the physical appearance and packaging of the substance, the price, and the prior November 15, 2024 fentanyl deal, investigators believe the substance contains fentanyl. The suspected fentanyl has been sent to the DEA laboratory for testing and the results are pending.

*On December 13, 2024, LOPEZ Transported Approximately 2.5 Kilograms of Suspected Fentanyl from New York to Massachusetts to Sell to the CW.*

23. At investigators' direction, the CW continued to communicate with LOPEZ to arrange another fentanyl transaction. On December 5, 2024, the CW and LOPEZ, using the Target Mobile Phone, exchanged numerous text messages. The calls and text messages described below were all conducted in Spanish. A Spanish-speaking investigator has listened to the recordings and reviewed the text messages and provided preliminary translations. In these text messages, in

lightly coded language, LOPEZ and the CW checked up on each other and ensured everything was "good" from the prior November 25, 2024 fentanyl deal.

24. On Friday, December 6, 2024, the CW had a recorded conversation with LOPEZ, using the Target Mobile Phone. In lightly coded language, the CW requested to purchase one or two kilograms of fentanyl from LOPEZ. The CW requested that the deal take place in Massachusetts the following week. LOPEZ stated that could provide the requested quantity of drugs the following week.

25. On Monday, December 9, 2024, the CW had a recorded conversation with LOPEZ, using the Target Mobile Phone. In that call, the CW confirmed that he wanted to purchase two kilograms of fentanyl on Thursday, December 12, 2024. The CW asked LOPEZ about the price, and LOPEZ responded it would be "31." Based on experience and training, and the price of a kilogram of fentanyl described above as $32,000, investigators believed that LOPEZ was prepared to sell the CW two kilograms of fentanyl for $31,000 per kilogram. In the same phone call, the CW also requested to receive an additional kilogram of fentanyl up front (for a total of three kilograms) and to pay for the third kilogram at a later date. LOPEZ stated that he would need to see if he could provide the third kilogram for a later payment. Based on experience and training, investigators know that when a drug customer has established trust with a drug supplier, the supplier is sometimes willing to "front" drugs or provide them on consignment for payment at a later date.

26. On Tuesday, December 10, 2024, the CW had a recorded phone call and exchanged text messages with LOPEZ, using the Target Mobile Phone. Over text message, the CW asked LOPEZ if he would be able to bring the third kilogram described above. LOPEZ responded that he was "working with a guy" on that. In the recorded phone call, in lightly coded language, the

9

CW followed up regarding the third kilogram to be "fronted." LOPEZ stated that his supplier reserved "two," meaning two kilograms, but that he would work on locating a third kilogram. The CW told LOPEZ that if LOPEZ was able to get the third kilogram, he should bring it up with the two kilograms that the CW planned to purchase. LOPEZ stated that when he arrived in Massachusetts, he wanted to discuss cocaine because he knew a supplier waiting on a large shipment. The CW acknowledged and told LOPEZ that he would send LOPEZ the address for the meeting the following day. LOPEZ acknowledged and stated that he wanted to leave early to drive up to Massachusetts.

27. On Thursday, December 12, 2024, the date of the planned drug transaction, the CW had recorded phone calls and exchanged text messages with LOPEZ, using the Target Mobile Phone. In lightly coded language, LOPEZ stated that he was experiencing delays obtaining the two kilograms of drugs and that they would need to move the date of the deal until Friday, December 13, 2024. LOPEZ stated that he only had 500 grams available for sale. The CW stated that he was disappointed and that he had customers waiting on these drugs. LOPEZ replied that he would bring up whatever he had. The CW stated that he should not come up to Massachusetts until he had the two kilograms. LOPEZ stated that he would be in touch. Later that same evening, on December 12, 2024, LOPEZ, using the Target Mobile Phone, called the CW and explained that he would be transporting approximately 2.6 kilograms of narcotics to the drug deal. Based on experience and training, investigators believed that LOPEZ would drive to Massachusetts with the fentanyl on December 13, 2024. The meeting was set to take place in Watertown, Massachusetts. The time of the deal was set for approximately 11:30 a.m.

28. On December 13, 2024, investigators met with the CW at a predetermined location. Investigators searched the CW and the CW's vehicle for contraband and currency with negative

results. Investigators equipped the CW with an audio/video recording device and provided the CW with $60,000 in OAF. The plan was for the CW to show the money to LOPEZ, but for investigators to seize the money back upon LOPEZ's arrest. During this meeting, location data for the Target Mobile Phone, obtained pursuant to a court-authorized warrant, indicated that the Target Mobile Phone was moving north from New York to Massachusetts. Additionally, text messages from LOPEZ, using the Target Mobile Phone, indicated he was on his way to the drug meeting. Investigators believed that LOPEZ was in possession of the Target Mobile Phone and that he was driving north with the agreed-upon fentanyl.

29. On December 13, 2024, at approximately 11:05 a.m., investigators surveilled the CW as he drove to the meeting location, a parking lot in Watertown, Massachusetts. The CW arrived in the parking lot at approximately 11:08 a.m. Investigators maintained surveillance in the parking lot to observe the expected drug deal.

30. At approximately 11:12 a.m., investigators observed LOPEZ driving his grey Honda CRV, bearing Massachusetts registration 1KCJ93, in the parking lot. LOPEZ parked his CRV next to the CW's vehicle. LOPEZ exited his vehicle and entered the front passenger seat of the CW's vehicle. Inside the vehicle, the CW showed $60,000 in OAF to LOPEZ and told LOPEZ that he could not take the money until he brought the drugs into the vehicle. LOPEZ then exited the CW's vehicle and went back to his CRV. LOPEZ opened the rear driver's side door of his CRV and grabbed a Metro T-Mobile shopping bag. LOPEZ then brought the bag back to the CW's vehicle. LOPEZ opened the rear passenger door of the CW's vehicle and placed the shopping bag

inside the vehicle. At that point, the CW put the OAF in the back seat and LOPEZ grabbed the OAF. LOPEZ then closed the door of the CW's vehicle and went back inside his CRV.

31.     The CW looked in bag, verified that it contained the suspected fentanyl, and informed investigators. LOPEZ drove his CRV to exit the parking lot and investigators stopped his vehicle. Investigators took LOPEZ into custody and seized the OAF. Investigators also seized two cellular phones from LOPEZ and his CRV. Investigators called the number assigned to the Target Mobile Phone and one of the cellular phones rang.

32.     While being surveilled by investigators, the CW drove back to the predetermined meeting location and met with investigators. The CW returned the audio/video recording equipment to investigators and provided the Metro T-Mobile shopping bag to investigators. Investigators searched the CW and the CW's vehicle for contraband and currency with negative results.

33.     Investigators inspected the Metro T-Mobile shopping bag. Inside the bag was a white cardboard box containing two bricks of compressed powder wrapped in green cellophane. One brick weighed approximately one kilogram. The second brick weighed approximately 500 grams. Also inside the Metro T-Mobile shopping bag was a separate brick wrapped in black plastic weighing approximately one kilogram. The substances were field tested which yielded an inconclusive result for fentanyl. Based on experience and training, investigators regularly conduct field tests of suspected fentanyl which yield inconclusive results, but later laboratory testing confirms the presence of fentanyl in the substance. Based on experience and training, the physical appearance and packaging of the substance, the price, and the prior November 15, 2024 and

November 25, 2024 fentanyl deals, investigators believe the substances contain fentanyl. The suspected fentanyl will be sent to the DEA laboratory for testing.

## Conclusion

34. I submit that there is probable cause to believe that on November 15, 2024, November 25, 2024, and December 13, 2024, LOPEZ committed three counts of distribution and possession with intent to distribute fentanyl, in violation of Title 21, United States Code, Section 841.

Respectfully submitted,

_Garrett Hassett_ DLC
Garrett S. Hassett, Special Agent
Federal Bureau of Investigation

Sworn to via telephone in accordance with Fed R. Crim. P. 4.1 on December __13__, 2024

_____
Honorable Donald L. Cabell
United States Magistrate Judge

13